UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

VICTOR QUINONES,

        Defendant.

19-CR-162

DECISION & ORDER

---

On December 10, 2019, the defendant, Victor Quinones, pleaded guilty to possessing with intent to distribute and distributing heroin (Count 1).  Docket Items 26 (plea agreement), 54 (plea transcript).  In the plea agreement, Docket Item 26, the government explicitly reserved its right to argue for an upward departure of the Sentencing Guidelines calculation because a death or serious injury resulted from Quinones's distribution of narcotics.  *See* United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") §§ 5K2.1, 5K2.2.  The government contended that drugs sold by Quinones caused the death of L.O. just after midnight on May 30, 2019.  Docket Item 42.  This Court therefore conducted an evidentiary hearing on that issue on June 7 and 8, 2021.  *See* Docket Items 67 (June 7, 2021 transcript), 68 (June 8, 2021 transcript).  Post-hearing submissions from both sides were completed by August 30, 2021.  *See* Docket Items 71, 75.

After hearing the testimony, reviewing the exhibits, and reading the submissions from both sides, this Court finds that the government has met its burden of proving by a preponderance of the evidence that the death of L.O. resulted from heroin and fentanyl distributed by the defendant.  The Court therefore concludes that an upward adjustment

of Quinones's Guidelines calculation may be appropriate under Guidelines section 5K2.1.

## FACTS[1]

**CHLOE ELLIS**

The first witness called at the hearing was Chloe Ellis, L.O.'s girlfriend. Docket Item 67 at 10. She testified that she and L.O. used heroin together from 2016 or 2017 until she went to rehab in 2019 because L.O. wanted her to "get clean." *Id.* at 12-14, 63. They had two sources for narcotics: Chris Suarez and "David" or "Victor," who Ellis identified at the sentencing hearing as Quinones. *Id.* at 19. Ellis and L.O. bought drugs from whomever had more potent drugs or was available. *Id.* at 30. Suarez often had more potent drugs, but he was available only from noon until 2 p.m. and from 4 p.m. until 6 p.m.; Quinones, on the other hand, was available virtually 24/7. *Id.* at 31, 51, 61.

Ellis successfully completed rehab on April 25, 2019, and she believed that L.O. had stopped using heroin by then as well. *Id.* at 12-13, 48. When Ellis got home from work at about 7:30 p.m. on May 29, 2019, however, she saw that L.O.'s pupils were constricted and suspected that he was using again. *Id.* at 14-15. She asked L.O. whether he was, but he denied it and became angry, so she did not ask again. *Id.*

Ellis made dinner and then fell asleep; when she woke up a short time later, L.O. was gone. *Id.* at 16. He later returned and said that he had been grocery shopping, but

---

[1] The facts are taken from what the Court found was the credible hearing testimony.

Ellis suspected that he was not being truthful with her.  *Id.* at 16, 18.  Ellis woke up a second time at about 11 p.m. and found L.O. installing an air conditioner.  *Id.* at 16.

Shortly after midnight, Ellis woke up again.  *Id.*  This time she found L.O. lying unresponsive in the corner of the kitchen.  *Id.*  His body was stiff, and he had a spoon in his hand.  *Id.*  She called an ambulance, but it was too late:  L.O. was dead.  *Id.* at 16-17, 56-57.

### DR. KATHERINE MALONEY

The Erie County Medical Examiner, Katherine Maloney, M.D., testified about the cause of L.O.'s death.  Docket Item 68.  Dr. Maloney based her conclusions on the autopsy report prepared by another doctor, Tara Mahar, M.D.; the investigation report by the on-scene investigator; the autopsy notes; and the toxicology report.  *Id.* at 10.  Dr. Maloney opined that the drug levels found in L.O.'s body were "sufficient to cause . . . death," and she concluded that the cause of death was a "drug overdose with fentanyl and heroin."  *Id.* at 37, 40-41.  She also opined that L.O. died "relatively quickly" after having taken the drugs.  *Id.* at 39.

### SPECIAL AGENT CLINT WINTERS

FBI Special Agent Clint Winters testified about the investigation into L.O.'s death.  Most important for the issue here, Winters went through the text messages and Facebook messenger conversations the day before L.O.'s death that were found on L.O.'s phone.  *Id.* at 82-87, 152-160.  Those messages established that L.O. had purchased $60 worth of drugs from Suarez around noon on May 29, 2019.  *Id.* at 154-

158.  But they also showed that later that day, L.O. and Quinones arranged a drug transaction.  *Id.* at 84-85.

More specifically, at 9:24 p.m. on May 29, 2019, L.O. sent a text message to a phone that Quinones admitted in the plea agreement was his.  *Id.* at 82-86; Docket Item 26 at ¶ 5b.  The following exchange then took place between 9:24 p.m. and 9:41 p.m.:

| | |
|---|---|
| L.O.: | For sure ny bad.  $40? |
| Quinones: | [K] got 4 for [you] |
| L.O.: | Cool now? |
| Quinones: | [Y]ea |
| L.O.: | 2 cool there in 3 minutes |
| Quinones: | [W]at |
| L.O.: | I[']m here |
| Quinones: | Go to Jewet[t] [and] [H]old[e]n |
| L.O.: | Try[i]ng to find it on gps |
| L.O.: | Here in silver [H]onda |

 Docket Item 67 at 81 (admitting Government Hearing Exhibit 11 into evidence), 84-86, 90.

Winters also testified about the police report and what was recovered at the scene of L.O.'s death.  *Id*. at 70-80.  According to the police report, officers found L.O. lying on the kitchen floor; they also found syringes in the garbage, a spoon in L.O.'s left hand, a hypodermic needle on the floor near the body, and car keys next to his leg.  *Id.* at 73-76.  Winters testified that at the Medical Examiner's office, investigators found two bags of suspected narcotics in the clothes that L.O. was wearing.  *Id.* at 76-79.  The

contents of those bags were later tested and found to contain heroin and fentanyl.  *Id.*  And Winters said that the bags also were tested for DNA and that Quinones's DNA was found on them.[2]  *Id.* at 135.

## DISCUSSION

Under Guidelines section 5K2.1, a court "may increase [a] sentence above the authorized guideline range" when "death resulted" from the relevant criminal conduct.  Courts "use the preponderance of the evidence standard to determine whether death resulted."  *United States v. Cordoboa-Murgas*, 233 F.3d 704, 710 (2d Cir. 2000).  Moreover, circumstantial evidence may be sufficient to prove that "death resulted" from a defendant's distributing drugs.[3]

---

[2] A DNA expert also testified and opined that the bags had on them the DNA of two individuals—one of whom was Quinones.  Docket Item 67 at 205.  More precisely, the DNA expert said that it was 216 billion times more likely that the bags had the DNA of Quinones and another unknown individual than that of two unknown individuals.  *Id.*

[3] *See, e.g., United States v. Bunkley*, 732 Fed. App'x 388, 391-92 (6th Cir. 2018) (upholding district court's upward departure under section 5K2.1 where the defendant "admitted that he sold heroin to [the victim] on the day before the body was found[;] . . . the coroner later determined that [the victim] overdosed after ingesting heroin and two other drugs[; t]he police found [the victim] in the field by [the defendant's] home—the very same place [the victim] regularly went to immediately inject the drugs he purchased from [the defendant; a]nd [the victim] was still holding a used syringe [when the police found his body], indicating that he died right after injecting the drugs"); *United States v. Salyers*, 661 Fed. App'x 862, 866 (6th Cir. 2016) (upholding district court's upward departure under section 5K2.1 where the defendant "admitted giving heroin to [the victim] two days before he overdosed and "offered no evidence at trial that some other supplier was the source of the heroin that caused [the] fatal overdose"); *United States v. Nossan*, 647 F.3d 822, 826 (8th Cir. 2011) (upholding district court's upward departure under section 5K2.1 where "[t]he autopsy revealed the cause of [the victim's] death was due to heroin toxicity . . . [and t]he only drugs found in the [victim's] apartment where [he] overdosed were left over from the packages [the defendant] admittedly sent [in the mail]"); *United States v. Ihegworo*, 959 F.2d 26, 27, 29 (5th Cir. 1992) (upholding district court's upward departure under section 5K2.1 where the defendant sold heroin to an individual and "asked her to deliver [the heroin] to [the victim]"; the victim died "[t]hree or

5

But even when it is more likely than not that death resulted from the defendant's conduct, courts retain broad "discretion" to decide "whether to depart and if so, by how much." *Id.* In deciding whether to depart, courts consider factors like those used to distinguish culpability in a homicide, including "the defendant's state of mind and the degree of planning or preparation." U.S.S.G. § 5K2.1. In deciding the appropriate level of increase, courts consider whether the death "was intended or knowingly risked[] and the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury." *Id.* "The text of [section 5K2.1] . . . makes clear that intent is not required [at the first step], referring to whether 'death *resulted*' from the offense and directing courts to *then* consider for sentencing purposes 'the extent to which death or serious injury was intended or knowingly risked.'" *Russow*, 2015 WL 1057513, at *3 (second emphasis added) (quoting U.S.S.G. § 5K2.1). In other words, "[t]he threshold determination depends only on the consequences of [the d]efendant's offense and his intent or lack thereof is considered as a mitigating or aggravating factor." *Id.*

---

four hours after" receiving that heroin; law enforcement recovered heroin "in the victim's apartment" that was "ninety-three percent pure"; and "the next day" the defendant sold "ninety-seven percent pure" heroin—that is, "extraordinarily pure heroin" compared to the "13 percent to 20 percent" product typically sold on the street—to an informant and an undercover law enforcement officer); *United States v. Russow*, 2015 WL 1057513, at *1-*2, *3 (D. Conn. Mar. 10, 2015) (finding under section 5K2.1 that death resulted where text messages and video footage showed that the defendant sold a certain "brand" of heroin to the victim three hours before he was found dead with empty containers of that same "brand" next to his body and the autopsy report listed "acute heroin toxicity" as the cause of death, despite the fact that the victim had purchased heroin from another dealer three days prior to his death, because text messages showed that the victim had used all of the other dealer's heroin and had "sought unsuccessfully to obtain more," creating "[t]he inference" that the victim did not "still ha[ve] a supply of heroin in his home" when he purchased the defendant's drugs).

6

So the question now before this Court is simply whether the government has proven by a preponderance of the evidence that L.O.'s death resulted from relevant conduct connected to Quinones's offense. Stated another way, the Court will address only the threshold issue of whether death resulted from Quinones's relevant conduct and reserve the issues of whether to depart—and, if so, by how much—for sentencing. And in deciding whether to depart—and, if so, by how much—the Court will consider, among other things, how confident it is about its factual conclusion. *See Cordoba-Murgas*, 233 F.3d at 709; *United States v. McCray*, 7 F.4th 40, 49 (2d Cir. 2021) ("A district court should . . . consider[] the degree of proof satisfied beyond a preponderance [of the evidence] when exercising its discretion to decide whether and how much to depart.").[4]

There is little doubt that L.O.'s death resulted from a drug overdose: The Medical Examiner testified that the cause of death was a "drug overdose with fentanyl and heroin," Docket Item 68 at 40-41, and the defendant does not contest that L.O. died from an overdose,[5] Docket Item 75 at 6. The only real question is whether the drugs that caused L.O.'s death came from Quinones or from Suarez, the other dealer who

---

[4] For example, if the conduct underlying an upward adjustment is proven by a standard greater than a preponderance of the evidence, such as beyond a reasonable doubt, a significant departure may be warranted. *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996). Conversely, if a higher standard is not met, a court should depart by less. *Id.* In other words, the weight of the evidence should justify the ultimate departure. *Id.*

[5] The defendant does question whether heroin alone, fentanyl alone, or heroin and fentanyl together caused L.O.'s death. See Docket Item 67 at 9; Docket Item 75 at 6. But because the two bags recovered from L.O.'s clothing and found to have Quinones's DNA contained both heroin and fentanyl, Docket Item 67 at 79, resolving that question is of no moment. Regardless of whether one or both drugs caused L.O.'s death, the question is simply who supplied those drugs.

supplied drugs to L.O. And although it is a close question, the Court finds that it is more likely that the drugs came from Quinones.

It is true that on the day he died, L.O. purchased drugs from Suarez early in the day. But it also is true that shortly before he overdosed, L.O. texted Quinones, "For sure ny bad, $40?" Docket Item 67 at 84.[6] Quinones responded, "K[. G]ot 4 for [you]." *Id.* at 85. The cell phone texts then show L.O. and Quinones communicating about a place to meet on Jewett Avenue in Buffalo. *Id.* at 86. And when L.O. was found dead just after midnight, he had two bags containing fentanyl and heroin in his pocket—bags with Quinones's DNA on them.

So the text messages and physical evidence suggest that L.O. needed a fix that night, contacted Quinones, purchased four bags from him at ten dollars each,[7] and had

---

[6] The government contends that "ny bad" means "need you bad," Docket Item 71 at 8; the defendant says that it was a typo—that L.O. meant "my bad" and was apologizing for his delayed response to Quinones just as Quinones had apologized to L.O. earlier, Docket Item 75 at 5. The defendant's reading is a stretch. L.O. had texted Quinones "Yo you good," but Quinones did not get back to him promptly. *Id.* at 4-5. So L.O. was expecting a response to his question, and Quinones apologized for not responding. Quinones's text to L.O., on the other hand, did not ask a question or otherwise suggest that a response was expected. So when L.O. contacted Quinones later, he had no reason to apologize for not responding. Moreover, because Quinones was supplying drugs to L.O. and L.O. was simply a customer, L.O. had no reason to contact Quinones unless L.O. wanted something. In other words, L.O. would have had no reason to apologize for not contacting Quinones sooner unless Quinones had asked L.O. something or otherwise indicated that he expected a response. Therefore, the Court agrees with the government that "For sure ny bad" likely means that L.O. was in dire need of drugs and that was why he contacted Quinones. In any event, whether "ny bad" means "need you bad" or was a typo for "my bad" does not change the fact that L.O. asked "$40?," that Quinones responded "got 4 for [you]," and that they communicated about a place to meet that same night. And that exchange demonstrates that L.O. likely needed a fix that night.

[7] Ellis testified that each bag cost ten dollars and that Quinones would have provided four bags in exchange for $40. Docket Item 67 at 21, 24, 32.

only two bags left when he was found dead.  As a matter of logic, it therefore is likely that L.O. used drugs from two of the bags supplied by Quinones before he died.  And because the Medical Examiner credibly testified that L.O. died shortly after ingesting the drugs that killed him, it is likely that the drugs provided by Quinones caused L.O.'s death.

To be sure, Quinones raises doubts about that conclusion.  He says that L.O. still may have had drugs supplied by Suarez earlier that day and that those drugs might have caused L.O.'s death.  Docket Item 75 at 6-7, 10-12.  He says that "ny bad" does not mean "need you bad" but means "my bad," thus questioning whether L.O. needed drugs from Quinones and suggesting that L.O. might well have had drugs left over from those purchased earlier.  *Id.* at 5.  He says that a text reading "2 cool"—sent by L.O. to Quinones after Quinones texted "got 4 for you"—does not mean "too cool" that his drugs were ready but means that he wanted only two bags, not four as he had requested five minutes earlier.[8]  *Id.* at 7.  Therefore, Quinones argues, the two bags found in L.O.'s pocket after L.O. died were the only bags he bought from Quinones, and the drugs that caused L.O.'s death must have been supplied by Suarez earlier that day.  *Id.*

It certainly is possible that Quinones is correct.  But the standard of proof here is by a preponderance of the evidence, not beyond a reasonable doubt.  And given the facts noted above, it is more likely that L.O. needed drugs that night; that his need for

---

[8] In his argument, the defendant omits Quinones's reply—"yea"—to L.O.'s question, "Cool now?"  Docket Item 75 at 7.  That omission is telling in light of the context.  L.O. said that he wanted $40 worth of drugs, and Quinones responded that he had "4 for" L.O. Docket Item 67 at 85.  L.O. then asked, "Cool now," and L.O. responded "yea."  *Id.*  So L.O.'s response of "2 cool" undoubtedly meant "too cool" that his drugs were ready now and not that he wanted only two—not four—bags of drugs.

9

drugs was why he contacted Quinones; that Quinones sold L.O. four bags of drugs for forty dollars as L.O. had asked; that L.O. used two of those bags; and that those drugs caused L.O.'s death.

Quinones also raises questions about the physical evidence. He says that the spoon in L.O.'s hand suggests not that L.O. had just used drugs but he was about to do so, *id.* at 8; in fact, Quinones asks, if L.O. had just used drugs, why is he holding a spoon and not a syringe? *Id.* He says that the absence of used syringes, a lighter, cotton, and baggies all create doubt about whether L.O. used drugs shortly before his death. *Id.* And if Quinones sold L.O. four bags of drugs, L.O. had two full bags in his pocket when he died, and L.O. used the rest of the drugs, Quinones asks, "where are the other two [empty] bags?" *Id.*

Those are good questions about the circumstances of L.O.'s death and the drugs that caused it. But the Medical Examiner testified that L.O. died "relatively quickly" after ingesting the drugs that killed him as evidenced by the blood chemistry, and the Court finds that testimony credible. And, as noted above, the Court finds it likely that L.O. purchased four bags of drugs from Quinones, not two, shortly before L.O. took the drugs that caused his death. So the absence of two empty bags and paraphernalia used to inject heroin and fentanyl may raise doubts, but it does not tip the balance or even equal the scales.

Finally, Quinones questions the credibility of Chloe Ellis, L.O.'s girlfriend, who at one time used drugs with L.O. and who testified about the relationship between L.O. and his drug dealers, including Quinones. *Id.* at 8-12. Indeed, Quinones suggests that Ellis may have cleaned up the death scene before the police arrived. *Id.* at 8. But the

Court found Ms. Ellis credible and has no reason to doubt her testimony.  Indeed, as Quinones seems to concede, she had no reason to lie to implicate Quinones.  *See id.* at 9 (Ellis "is not a malicious liar bent on pinning the defendant with blame.").  And while it is true that she once used drugs, perhaps more recently than she admitted, her recollection about the key events surrounding L.O.'s death impressed the Court as both credible and reliable.

In sum, the Court finds that the government has proven by a preponderance of the evidence that drugs sold by Quinones caused L.O.'s death and that an upward departure therefore may be warranted under Guidelines section 5K2.1.  But because it is a close question, the Court will factor the uncertainty into whether to depart—and, if so, by how much.

## **CONCLUSION**

The government has proven by a preponderance of the evidence that Quinones supplied the heroin and fentanyl that resulted in the death of L.O.  Therefore, this Court "may increase the sentence above the authorized Guidelines range" consistent with the death policy statement in Guidelines section 5K2.1.  In their sentencing submissions, the parties should address (a) "whether to depart" and (b) "if so, by how much." *Cordoboa-Murgas*, 233 F.3d at 710.  In addressing these questions, the parties should discuss (a) Quinones's "state of mind and the degree of planning or preparation" and (b) whether L.O.'s death "was intended or knowingly risked[] and the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury." U.S.S.G. § 5K2.1.

Sentencing is rescheduled for December 10, 2021 at 11:00 a.m. Sentencing Factors Statements/Sentencing Motions are due by November 5, 2021. Objections/Responses to Sentencing Factors/Motions are due by November 19, 2021. Character letters are due by November 26, 2021. Finally, any motions to adjourn are due by November 29, 2021. Failure to meet these deadlines may result in an adjournment of the sentencing.

SO ORDERED.

Dated: October 22, 2021
       Buffalo, New York

LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE